UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at KNOXVILLE

JERRY BAXTER GRAVES )
)
v. ) NO. 3:08-CV-480
) *Jordan/Guyton*
DAVID MILLS, Warden )

## **MEMORANDUM OPINION**

Jerry Baxter Graves, a state prisoner proceeding *pro se*, brings this petition for

a writ of habeas corpus under 28 U.S.C. § 2254, challenging the legality of his confinement

pursuant to his 2000 Knox County, Tennessee convictions for felony murder and especially

aggravated robbery, [Doc. 3]. Warden David Mills has filed a response, which is supported

by copies of the state court record, [Doc. 7, Attachments A- J; Doc. 12, Attachments 1-3;

Doc. 14, Attachment 5], and Graves has filed a reply to the response, [Doc. 17]. Thus, the

case is ripe for disposition.

The Warden submits, in his response, that Graves is not entitled to relief from

the state court decisions rejecting certain claims on the merits, given the deferential standards

of review set forth in 28 U.S.C. § 2254. Respondent further submits that the remaining

claims have been procedurally defaulted. The Court agrees with the Warden and, for the

following reasons, will **DENY** the petition and **DISMISS** this case.

### **I. Procedural History**

For Graves' convictions, he received sentences of life imprisonment for the

felony murder and a concurrent twenty-three years for the aggravated robbery. Both

convictions were affirmed on direct appeal by the Tennessee Court of Criminal Appeals,

*State v. Graves*, No. E2001-00123-CCA-R3-CD, 2002 WL 459014 (Tenn. Crim. App. Mar.

26, 2002), and the Tennessee Supreme Court. *State v. Graves*, 126 S.W.3d 873 (Tenn. 2003). After Graves' subsequent application for post-conviction relief was denied, *Graves v. State*, No. E2007-00064-CCA-R3-PC, 2008 WL 588860 (Tenn. Crim. App. Mar. 5, 2008), *perm. app. den.* (Tenn. 2008), he filed this instant habeas corpus petition.

## II. **Factual Background**

The factual recitation is from the Supreme Court's opinion on direct review of

Graves' convictions.

> According to the testimony of Adam Faw, in the early morning hours of October 17, 1998, the defendant Graves, Takeita Locke, Christina Martin, and Faw drove around Knoxville in Faw's van while drinking alcohol and smoking marijuana laced with cocaine or crack. After a few hours, Graves directed Faw to go to an apartment in Montgomery Village so that he could rob someone. Upon arrival, Graves got out of the van carrying Faw's pistol and headed towards an apartment.

> Robert Richards testified that he, Karen Verklas, and the victim, Chuck Newman, were hanging out in Verklas' apartment when Graves kicked in the door. After Graves knocked the apartment door open, he forced Newman into the kitchen, and backed him up against the stove. Richards said that he initially thought the defendant was only playing, but then he heard the defendant repeatedly saying "give me the money." Richards testified that when Newman refused, Graves wrestled Newman onto the living room couch and started beating him on the head while continuing to demand money. At the same time, Locke was also trying to pry the victim's hands open. Richards unsuccessfully tried to pull Graves off of Newman, after which he left the apartment to find help. Once outside, he found Verklas, who had fled the apartment to call 911. Richards testified that he saw Graves and Locke leave the apartment and overheard Graves tell Locke that the victim had at least $150.

> Faw testified that Graves and Locke came running out of the apartment building and got back into his van. Faw noticed that Graves had blood all over his arms and jacket. When Faw asked

2

Graves if he had gotten anything, Graves responded that he had gotten $50.

The defendant Graves testified and conceded that he had beaten Newman with a pistol and stabbed him with a knife. He claimed that Newman took crack cocaine from him and refused to pay for it. Newman eventually died from the stab wound to his chest.

*Graves*, 126 S.W. 3d at 875 -876 (internal footnote omitted).

## III. Discussion

Graves' habeas corpus application contains six grounds for relief: 1) the trial court failed to dismiss the indictment, 2) he was denied his right to confront Witness Verklas and 3) Witness Richards, 4) the trial court made an evidentiary error (admission of inflammatory photographs), 5) counsel gave him ineffective assistance, and 6) the state court's resolution of Ground 5 was contrary to Supreme Court precedent. hese claims have been organized into two categories for purposes of discussion. The first category encompasses procedurally defaulted claims (Grounds 1, 3, and 4) and the second adjudicated claims (Grounds 2, 5, and 6).

### A. Procedurally Defaulted Claims

Under 28 U.S.C. § 2254(b) (1), a state prisoner's petition for a writ of habeas corpus will not be granted unless he has exhausted his available state court remedies. He does so by "fairly presenting" the substance of each of his federal constitutional claims to the state courts for disposition. *See Hannah v. Conley*, 49 F.3d 1193, 1196 (6th Cir. 1995). The claim must be offered on a constitutional basis—not merely as one arising under state law. *See Duncan v. Henry*, 513 U.S. 364, 365-366 (1995) ("If state courts are to be given the opportunity to correct alleged violations of prisoners' federal rights, they must surely be alerted to the fact that the prisoners are asserting claims under the United States

3

Constitution."); *Stanford v. Parker*, 266 F.3d 442, 451 (6th Cir. 2001) (holding that a claim must also be offered on a federal constitutional basis—not just a state law basis).

A prisoner who has failed to present a federal claim to the state courts, and who is now barred by a state procedural rule from returning with his claim to those courts, has committed a procedural default. *Coleman v. Thompson*, 501 U.S. 722, 732 (1991). A state procedural default also occurs when a petitioner actually offers his claim to state courts, but those courts reject it on the basis that he failed to comply with a state procedural rule which governs its presentation. *See Murray v. Carrier*, 477 U.S. 478 (1986); *Wainwright v. Sykes*, 433 U.S. 72 (1977). Federal review of a procedurally defaulted claim is foreclosed, unless the habeas petitioner can show cause to excuse his failure to comply with the state procedural rule and actual prejudice resulting from the alleged constitutional violation. *Coleman*, 501 U.S. at 732.

## 1. *Denial of Due Process (Refusal to Dismiss the Second Indictment (Pet., Ground 1))*

Graves' original indictment for felony murder and especially aggravated robbery was dismissed upon his motion because he had not been granted a preliminary hearing. A warrant then was filed charging him with the same crimes. This resulted in a preliminary hearing in the Knox County General Sessions Court, but the audiotape of the hearing was blank. A second indictment was issued; Graves again moved to dismiss it and to remand for a second preliminary hearing; the trial court denied the motion; the trial commenced; and he was convicted of both charges. The issue was raised and argued in a motion for a new trial and presented as a claim on direct appeal. Graves' federal claim is that the failure to dismiss the indictment and grant him a new preliminary hearing was an arbitrary application of law which violated his right to due process.

4

Respondent argues that the claim has been procedurally defaulted because the claim which was offered in state court was raised only as a violation of state law and not as a violation of the Constitution. In his reply to this argument, Graves implicitly acknowledges that he did not present the claim as a federal constitutional infringement, but maintains that a federal court can review state court decisions even if they were based solely on state law to determine whether the application of state law is so arbitrary and capricious as to amount to an independent violation of due process. He further suggests that the state court's factual determination upon which rested its decision was unreasonable.

The Court has reviewed petitioner's state court pleadings. In Graves' brief on direct appeal, he argued that the failure to dismiss his second indictment was prejudicial and a violation of a state criminal procedural rule, the required remedy for which was a dismissal of the indictment. Thus, the record shows that Graves failed to raise the claim in the state courts as a constitutional violation, and he may not do so now due to the bar presented by the one-year post-conviction statute of limitations in Tenn. Code Ann. § 40-30-102(a). By failing to raise the claim on a constitutional basis, Graves has committed a state procedural default. Furthermore, he has not shown, or even alleged, cause and prejudice to surmount the default, and he, thereby, has forfeited federal habeas corpus review.

But even if the issue were not procedurally defaulted, where state courts have spoken on a matter of state law, it is not the role of a federal habeas court "to reexamine state-court determinations of state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). A decision, which rests entirely state law, generally is not of federal concern. *See e.g., Swarthout v. Cooke*,___ U.S.___, 131 S.Ct. 859, 861, 178 L.Ed.2d 732 (2011) (*per curiam*) (claims which allege a state law error or an incorrect application of state law do not present cognizable issues for federal habeas review). However, an error of state law, as

5

explained in *Estelle v. McGuire*, 502 U.S. 62 (1991), a case cited by Graves, is cognizable in a federal habeas corpus proceeding if it rises to the magnitude of a due process violation. *Id.* at 68 ("In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." ).

The Court sees nothing about the claim which would rise to the level of a violation of due process. At any rate, Graves has not cited to a Supreme Court case to show that the state courts' determination regarding this claim was contrary to or unreasonable application of federal law. Nor has he provided anything specific with regard to his allegation that the decision was based on an unreasonable factual determination. Graves is not entitled to relief on this issue.

## 2. *Denial of the Right to Confront Mr. Richards (Pet., Ground 3)*

Graves asserts, in this claim, that he was prohibited from impeaching the credibility of Robert Richards, though Richards was one of only two significant witnesses. Graves' conviction or acquittal, so he maintains, rested in large part on the jury's belief of Richards' testimony, but the trial court refused to allow the witness to be questioned about whether he expected favorable treatment on his pending charge of a violation of his parole. (As shown below, the charge actually involved a violation of *probation*.)

Respondent Warden maintains that this claim too has been procedurally defaulted. He cites to the Court of Criminal Appeals' opinion to verify that the state appellate court declined to address the merits of this Sixth Amendment claim due to Graves' failure to raise the claim on a constitutional basis in the trial court. Graves, in his reply, argues that the state court, in its opinion, did not rely upon the procedural bar, but addressed the claim on the merits, and that this Court may do likewise.

That opinion reads, in relevant part:

6

> Thus, the trial court declined to allow cross-examination as to Richards's pending violation of probation warrant, the defendant's argument being that the commission of these acts go to his "honesty and truthfulness." However, the argument in this court is that the cross-examination was proper because it would demonstrate Richards's motive to please the prosecution. As stated in *State v. Banes*, 874 S.W.2d 73, 82 (Tenn. Crim. App. 1993), "[a]n appellant cannot change theories from the trial court to the appellate court." Accordingly, we conclude that this issue is not properly before this court.

*Graves*, 2002 WL 459014, *13.

The above excerpt from the Court of Criminal Appeals' opinion discloses that the state court, indeed, relied upon the procedural default. The fact that the state court made an alternative finding that the evidentiary claim lacked merit does not undercut its reliance on procedural default. The rule is this: Where a state court rejects a claim on the merits and, alternatively, for failure to comply with a procedural rule, the procedural default doctrine is deemed to have been invoked. *Harris v. Reed*, 489 U.S. 255, 264 n. 10 (1989).

When a procedural default of this type is alleged, the Court must apply the factors in *Maupin v. Smith*, 785 F.2d 135 (6th Cir. 1986) to determine: (1) whether there is an applicable state procedural rule and whether Graves failed to comply with it, (2) whether the rule was enforced against him; (3) and whether the rule is an adequate and independent state ground (i.e., one which serves "a legitimate state interest," *see Henry v. Mississippi*, 379 U.S. 443, 447 (1965)) on which the Warden can rely to foreclose federal habeas review. *Id.* at 138. If, under these factors, a procedural default has occurred, it may be overlooked upon a showing of cause and prejudice. *Ibid.*

In this case, Tennessee has a rule which disallows a claim to be offered to a state appellate court based on a theory different from the one which supported the claim in the trial court. *See, e.g., State v. Kiser*, 284 S.W.3d 227, 290 (Tenn. 2009) ("A party is bound

7

by the evidentiary theory argued to the trial court and may not change or add theories on appeal.") (citing *Banes*); *State v. McPherson*, 882 S.W.2d 365 (Tenn. Crim. App. 1994). This rule was actually enforced against Graves and the Court finds that the rule is adequate and independent and, altogether, sufficient to bar federal review. The reason this is so is that a state appellate court's review of an claim, ordinarily, is confined to the record from the lower court, which contains an explanation of the law which was applied and the reasoning employed to decide the claim. Offering a new theory on appeal would disrupt the state's orderly appellate review scheme and, clearly, a state possesses a legitimate interest in having an efficient and smoothly-functioning court system. *Reed v. Ross*, 468 U.S. 1, 11 (1984) (recognizing that "in some circumstances considerations of comity and concerns for the orderly administration of criminal justice require a federal court to forgo the exercise of its habeas corpus power" and that "legitimate state interests may be frustrated" by habeas corpus review of claim "not properly raised before the state court").

Based on the above analysis, the Court concludes that Graves committed a procedural default of this claim and, absent any allegation of cause and prejudice, that he has forfeited federal review of his confrontation claim involving this witness.

3. *Admission of Inflammatory Photograph (Pet., Ground 4)*

In this claim, Graves maintains that the proof of (criminal?) intent was close and that the prosecution was permitted to nudge the jury towards conviction through the admission of an inflammatory photograph depicting "the victim's scalp being moved back so that his brain could be removed," [Doc. 3, Pet. at 10]. The presentation of the photo to the purview of the jury, so Graves argues, caused it to decide the case based on emotion rather than facts and violated his right to due process of law, as secured to him by the Fourteenth Amendment.

8

The Warden asserts that a procedural default occurred when Graves challenged this ruling in the state courts based only on Tennessee's law of evidence, rather than on a federal constitutional footing. The Warden is correct in his assertion, as shown in Graves' brief on direct appeal, [Doc. 7, Attachment A at 20-22]. As noted, a procedural default ensues where a petitioner fails to present a claim to the state court on substantially the same factual and legal bases upon which he presents it in his federal petition. *See Vasquez v. Hillary*, 474 U.S. 254, 260 (1986); *Picard v. Connor*, 404 U.S. 270, 278 (1971); *see also Stanford v. Parker*, 266 F.3d 442, 451 (6th Cir. 2001) (for federal exhaustion purposes, a claim must be raised on a constitutional basis).

Graves concedes this point in his reply, but he insists, liberally construing his arguments, that because state courts have reversed other close cases based on such errors, its failure to reverse his case, which was also close, was arbitrary and capricious. Graves' argument is rejected.

The Supreme Court has held that, unless a state court's evidentiary ruling is so egregious as to deprive a defendant of a fundamentally fair trial, "a perceived error of state law" is not a cognizable in a habeas corpus action. *Pulley v. Harris*, 465 U.S. 37, 41 (1984); *accord, Estelle v. McGuire*, 502 U.S. 62, 67-68. However, the holding on an error so egregious as to deny due process has no bearing on the issue at hand because that ruling did not involve a procedurally defaulted claim, but instead a claim which had been offered to the state courts on several occasions and thereby exhausted. *Id.* at 40 and n 2. Given that the procedural posture of Graves' claim is distinguishable from the one in *Pulley*—the federal claim sub judice was never offered to the state courts—it is irrelevant to a procedural default analysis. *See Hutchison v. Marshall,* 744 F.2d 44, 46 (6th Cir.1984) (observing that it is "axiomatic that state courts are the final authority on state law").

9

This Court has found that Graves' claim has been procedurally defaulted. No cause and prejudice is alleged, and federal review is unavailable for the claim.

## B. **Adjudicated Claims**

Under the review standards set forth in 28 U.S.C. § 2254(d), a court considering a habeas claim must defer to any decision by a state court concerning that claim unless the state court's judgment (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C.A. § 2254(d)(1)-(2).

A state court's decision is "contrary to" federal law when it arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or resolves a case differently on a set of facts which cannot be distinguished materially from those upon which the precedent was decided. *Williams v. Taylor*, 529 U.S. 362, 413 (2000). Under the "unreasonable application" prong of § 2254(d)(1), the relevant inquiry is whether the state court decision identifies the legal rule in Supreme Court cases which governs the issue but unreasonably applies that principle to the particular facts of the case. *Id.* at 407. The habeas court is to determine only whether the state court's decision is objectively reasonable, not whether, in the habeas court's view, it is incorrect or wrong. *Id.* at 411.

This is a high standard to satisfy. *Bowen v. Jones*, 2012 WL 573863, *5 (6th Cir. Feb. 22, 2012) (observing that to prevail on a state-court adjudicated claim, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement") (citing *Harrington v.*

10

*Richter*, 131 S.Ct. 770, 786-87 (2011)). Further, findings of fact which are sustained by the record are entitled to a presumption of correctness—a presumption which may be rebutted only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

1. *Denial of the Right to Confront Ms. Verklas (Pet., Ground 2)*

Graves asserts that the trial court's undue restriction of his cross-examination of prosecution witness Karen Verklas violated his confrontation right under the Sixth and Fourteenth Amendments of the U.S. Constitution.

During the defense's cross examination of Ms. Verklas' trial testimony, she was asked whether she was "awaiting trial right now for assault," to which she responded, "So?" The prosecutor objected; the objection was sustained; and thereafter the following exchange occurred:

Q. That is correct though. You are the Karen Verklas that was convicted of worthless checks?

A. Yes.

MS. SHIPLEY: That is all I have of this witness, Your Honor.

*Graves*, 2002 WL 459014 at \*8.

Graves maintains that the verdict was extremely close and that his conviction or acquittal hinged on the jury's assessment of the credibility of this witness. Here, as he did in the state appellate court, Graves contends that, despite the centrality of Ms. Verklas' credibility, the trial court prohibited him from questioning this witness about her pending criminal charge. Moreover, her fiancé, Mr. Richards, also had a charge pending against him. Graves posits that, had this line of questioning been permitted, it would have shown the bias of this witness and, by inference, that she expected favorable treatment from the prosecution

11

in exchange for her testimony, and thus, her credibility with the jury would have been undermined.

When presented with this issue on direct appeal, the Tennessee Court of Criminal Appeals first observed that "[a] defendant has the right to examine witnesses to impeach their credibility or to establish that the witnesses are biased" and that unduly restricting this right may infringe on the right of confrontation as secured by the Sixth Amendment to the U. S. Constitution. *Graves*, 2002 WL 459014 at \*9. Observing that the defense had not requested a jury-out hearing, as provided by Tennessee's procedural rules, the state court pointed out that the record was devoid of information as to when the assault charge arose or whether it was still pending. It then recast the question presented as whether there was reversible error when the trial court denied Graves an inquiry into an assault charge against a witness which had arisen at an unspecified time in an unspecified jurisdiction.

The intermediate state court found it significant that Ms. Verklas' testimony, in the main, was in harmony with that given by Graves and that, since she stated that she had left the apartment before the killing blows were administered, it did not contradict the most critical part of Graves' testimony. Also found important was the consistency of her testimony throughout Graves' trial and his seventeen-year- old codefendant's trial and juvenile court transfer hearing. Furthermore, the state court noted that Ms. Verklas had been impeached with her prior worthless check convictions and that the jury had not been instructed to disregard her response of "So?" when she was asked if she was "awaiting trial right now for assault." The state appellate court concluded, based on the above reasoning, that if an error had been committed by restricting cross-examination of Ms. Verklas, the limitation had resulted in no harm to Graves.

12

The Sixth Amendment guarantees a criminal accused the right "to be confronted with the witnesses against him," U.S. CONST. amend. VI, the purpose of which is "to secure for the opponent the opportunity of cross-examination." *Davis v. Alaska*, 415 U.S. 315-16 (1974). The constitutionally protected right of cross-examination encompasses a search for a witness's biases. *Id.* at 316-17. Although a trial court has considerable discretion to set reasonable limits on cross examination based on concerns regarding harassment, prejudice, confusion of the issues, or repetitive or only marginally relevant interrogation, *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986), that discretion cannot be exercised in a way that prevents the defense from offering to the jury "facts from which bias, prejudice or lack of credibility of a prosecution witness might be inferred," so as to protect a criminal accused's right "to develop facts which might undermine a government witness's credibility." *Stewart v. Wolfenbarger*, 468 F.3d 338, 347 (6th Cir. 2006) (quoting *Dorsey v. Parke*, 872 F.2d 163, 167 (6th Cir.1989)). So long as a jury had enough information to assess the defense's theory, regardless of the limits placed on otherwise permitted cross-examination, no constitutional violation occurs. *Id.*

The state court assumed but did not actually find a constitutional error. It then determined that any such an error had been harmless beyond a reasonable doubt. Although the state court did not identify the test it used to find harmless error, its analysis tracks the harmless error analysis announced in *Chapman v. California*, 386 U.S. 18 (1967), which is the one to be applied on direct review.[1]

---

[1] *Chapman* holds that an error is deemed harmless if a court can conclude, beyond a reasonable doubt, that the questioned evidence did not contribute to the conviction. *Id* at 25-26.

13

As the state court implicitly recognized, an error involving the denial of the opportunity to impeach a witness for bias is subject to a harmless-error analysis. *Van Arsdall*, 475 U.S. at 684. This Court, as did the state court, will assume constitutional error, but will apply a different harmless error test—the one articulated in *Brecht v. Abrahamson*, 507 U.S. 619 (1993), which allows habeas relief only if the error had a "'substantial and injurious effect or influence in determining the jury's verdict.'" *Id.* at 623 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). A "substantial and injurious effect" exists when the court finds itself in "grave doubt" about the likely effect of the error on the jury's verdict; "grave doubt" exists where the issue of harmlessness is "so evenly balanced that [the court] feels [itself] in virtual equipoise as to the harmlessness of the error." *O'Neal v. McAninch*, 513 U.S. 432, 435 (1995). The harmlessness determination is based on "a de novo examination of the trial record." *Brecht*, 507 U.S. at 642.

Among the factors for determining whether an error is harmless *vel non* are "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Van Arsdall*, 475 U.S. at 684. The *Van Arsdall* factors are applied to assess whether a violation of the right to confront is harmless under *Brecht*. *Jensen v. Romanowski*, 590 F.3d 373, 378 (6th Cir. 2009).

a. *Importance of Testimony*

Ms. Verklas was one of two witnesses who testified that they were present in the apartment when the victim entered and, as Ms. Verklas was closing the door, Graves entered and instructed the victim to go to the kitchen. These witnesses stated that Graves and

14

the victim went into the kitchen, where Graves paced back and forth, while the victim leaned against the cabinets. Both witnesses testified that Graves had a pistol, into which he chambered a cartridge of ammunition, while repeatedly demanding money from the victim. They stated that the victim and Graves came into the living room where the victim ended up lying on his back on the sofa, with Graves on top of him, and that, as two struggled, Graves' girlfriend and codefendant joined them, stood at the end of the sofa over the victim's head, and helped her boyfriend attempt to pry open the victim's hands. Thus, while Ms. Verklas's testimony was valuable to the prosecution, she was not the only witness who testified to these events. Nor could she be characterized as a key witness since she left the apartment while Graves, his girlfriend, and the victim struggled on the couch and did not see and, thus, could not testify as to the circumstances surrounding the actual stabbing of the victim with the kitchen knife or the pistol blows delivered to the victim's head. Moreover, as the state court noted and the record bears out, Ms. Verklas's testimony agrees in certain material respects with Graves' trial testimony.

### b. *Cumulative Testimony*

As observed in the preceding discussion, Ms. Verklas' testimony was substantially the same as that given by Richards, who also was present in the apartment during the criminal episode. Both stated that the victim knocked, identified himself, and was admitted to the apartment by Ms. Verklas, who opened the door, and that, as she was closing the door, Graves entered, uninvited. Graves and the victim went into the kitchen, where Graves demanded that the victim give him "the money." Both witnesses testified that Graves had a pistol, that they heard him chamber a round of ammunition, and that Graves was holding the gun to the victim. And again, Graves' own testimony tracked Ms. Verklas' testimony on significant points.

15

c. *Evidence to Corroborate or Contradict Testimony*

Graves testified on direct, in contradiction to one of Ms. Verklas' statements, that he did not chamber a round of ammunition in the firearm while he was in the kitchen. But this discrepancy is relatively immaterial since the firearm was used to beat the victim, not to shoot him, and since Graves acknowledged that he struck the victim in the head with the pistol. Additionally, Mr. Richards also testified that Graves loaded a cartridge into the chamber of the handgun. As the state court observed, Ms. Verklas' testimony mostly paralleled Graves' testimony and did not contradict the crucial parts of his testimony. Also, the testimonies of two witnesses, Adam Faw, the driver of the car in which Graves and his girlfriend had ridden to and from Montgomery Village, and Christina Martin, his passenger, contained details about events which occurred and statements which were made just prior to and after the murder, as well as a description of blood they observed on Graves' coat after he returned and jumped into the car. Those details interlocked with the testimony given by Ms. Verklas.

Too, the testimony of the medical expert who performed an autopsy on the victim's body disclosed that the victim had sustained three moderately hard blows to his skull, one of which broke the skull, as well as the fatal stab wound to the heart—a wound consistent with the bloody kitchen knife Ms. Verklas identified as belonging to her and which the crime scene investigators located on the carpet near the front door. Finally, the investigation performed at the crime scene likewise supported the witnesses' testimony as to the unfolding of the criminal episode.

d. *Extent of Permitted Cross-Examination*

The single restriction placed on defense counsel's cross-examination of Ms. Verklas is the one which is being challenged in this petition. All other questions posed by

16

Graves' attorney to this witness were allowed without objection. Furthermore, the state court noted, and the record supports, that Ms. Verklas had been impeached with her prior bad-check convictions and that the jury had been allowed to consider her response, "So?", when she was asked whether she was "awaiting trial right now."

e. *Strength of the State's Case*

The state court had a very compelling case against Graves, with the testimony of the four witnesses discussed above. In their testimonies, Ms. Verklas and Mr. Richards recounted the circumstances immediately preceding and following the victim's beating and stabbing. Mr. Faw and Ms. Martin supplied details concerning Graves' conversation prior to and during their journey to Montgomery Village and a description of his appearance, conduct, and verbal responses following his hurried exit from Ms. Verklas' apartment.

All these factors weigh in favor of a determination that any constitutional error, if in fact committed, did not have a substantial and injurious effect on the jury's verdict and was, therefore, harmless. Of this, the Court has no grave doubt or any doubt whatsoever.

Based on the above analysis, the Court concludes that Graves is not entitled to the writ of habeas corpus with respect to his first claim.

2. *Ineffective Assistance of Counsel (Pet., Grounds 5 and 6)*

Graves submits that, in violation of his right under the Sixth Amendment, he received ineffective assistance from his attorney, Susan E. Shipley, with respect to a single error. Graves charges that she failed to pursue a defense involving a "drug deal gone bad," which resulted in his conviction of a greater offense than of which he otherwise would have been convicted. He maintains that his lawyer later admitted that the record contained information to support this defense theory and to strongly discredit the self-defense theory she primarily advanced. Graves also faults the state appellate court's standard of review of

17

this claim, contending the state court improperly afforded deference to trial counsel's strategy, regardless of whether a different strategy theoretically could have led to a different result.

When this claim was offered during Graves' his post-conviction appeal, the Court of Criminal Appeals held, in relevant part, as follows:

> We conclude that the petitioner has not demonstrated that his trial counsel was ineffective. The petitioner complains that his trial counsel argued and brought up evidence of self-defense at the trial. However, as trial counsel testified, the petitioner's own account of what occurred was that he stabbed the victim in self-defense. Moreover, trial counsel raised evidence and argument regarding a drug transaction between the petitioner and victim to refute evidence that the petitioner killed the victim during the course of a robbery. The evidence shows that trial counsel adequately prepared for trial, which included meeting with the petitioner many times, interviewing witnesses, and examining the crime scene. We give deference to the trial strategy that counsel used, regardless of whether a different strategy theoretically could have led to a different result. We conclude that trial counsel's performance was not deficient and that the petitioner did not receive the ineffective assistance of counsel.

*Graves*, 2008 WL 588860, at *4.

The relevant legal rule governing a claim of ineffective assistance is found in *Strickland v. Washington*, 466 U.S. 668 (1984), a case cited by Graves. *Williams v. Taylor*, 529 U.S. 362, 390 (2000) (*Strickland* "squarely govern[s]" such claims). To establish an ineffectiveness claim, a petitioner must show that counsel's performance was deficient and that the deficient performance prejudiced the defense so as to render the trial unfair and the result unreliable. *Strickland*, 466 U.S. at 687. Though a reviewing court's scrutiny of counsel's performance is highly deferential, a petitioner who demonstrates that counsel's representation fell beneath an objective standard of reasonableness will establish a deficient performance. *Id* at 687-88. However, an attorney's conduct is not judged in hindsight, but must be evaluated for reasonableness under the circumstances existing at the time of the

18

alleged error. *Id.* at 690. To show prejudice, a petitioner must demonstrate that there is a reasonable probability, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 694.

In considering petitioner's claims of attorney error, the Tennessee Court of Criminal Appeals cited extensively to *Strickland*, and, thus, its decision was not "contrary to" clearly established federal law as determined by the Supreme Court. The factual conclusions reached by the state appellate court, following its review of the record, will be presumed correct, *Brumley v. Winard*, 269 F.3d 629, 637 (6th Cir. 2001), because petitioner has offered no clear and convincing evidence to contradict them. The question then becomes whether, in disposing of this claim, the state court unreasonably applied *Strickland*. An additional hurdle presented by § 2254(d) is that the question is not "whether counsel's actions were reasonable," but instead, "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id*. at 788.

As noted in the appellate court's opinion, Ms. Shipley testified at the post-conviction hearing as to her reasons for offering a self-defense theory to combat the felony murder charge. She explained that the self-defense theory was constructed based on Graves' own account of the events surrounding the crimes, [Doc. 12, Attachment 2, Post-Conviction Hr'g Tr. at 33] ("And Mr. Graves' account to me was that this was a drug deal, and that he and this man got in a fight, and he wound up killing him in self defense."). Ms. Shipley testified that there was no question that Graves had killed the victim and that he insisted that he, not his codefendant girlfriend, had stabbed the victim. The proof, as she recalled, showed that the victim was unarmed; that Graves carried a firearm into the apartment; and that the victim sustained head wounds caused by blunt force trauma from a pistol. Graves had testified at trial that he and the victim struggled after the victim refused to pay him for crack

19

cocaine; that Graves hit him on the head with the pistol; and that the victim took the pistol away from Graves, who then "tried to stab him in his arm to make him drop the gun," [Doc. 12, Attachment 1, T. Tr. at 154-55]. However, the victim was stabbed in the heart, though Graves explained that he "wasn't trying to stab him in the heart," that he "didn't mean to," and that he "didn't try to take his life," [*Id.*].

Though Ms. Shipley acknowledged that interposing self-defense was a "difficult scenario" under these facts, she believed that a self-defense strategy was compelled based on Graves' account and his testimony to this effect. It is fitting to fashion a strategy based on what a criminal accused tells his attorney about the circumstances surrounding a criminal episode. *Strickland* teaches that the reasonableness of the challenged actions "may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant." *Strickland*, 466 U.S. 691. According to counsel's testimony, she discussed trial strategy and Graves' testimony and prepared him to testify during her frequent meetings with him, with the logical implication being that he was not only aware of that self-defense would be asserted on his behalf to combat the felony murder charge but that he also agreed (at least tacitly) with that strategy.

Moreover, when asked how she thought the jury would receive Graves' testimony that, after he had struck the victim with a gun (receiving, according to the record, a blunt force trauma to his head), somehow the victim was able to get possession of the weapon, Ms. Shipley responded that she "thought Mr. Graves was a fairly credible witness in his testimony," [Doc. 12, Attachment 3, Post-Conviction Hr'g Tr. at 41]. Had the jury shared counsel's assessment of Graves' testimony, in which he described the events surrounding the homicide as a "drug deal gone bad," and explained the stabbing as an

20

exercise of his right of self-defense, the trial might have culminated, at worst, in a second degree murder conviction, or, at best, in an acquittal. As it happened, the jury did not accredit Graves' testimony and he was convicted of felony murder.

A trial strategy " need not be particularly intelligent or even one most lawyers would adopt, but it must be within the range of logical choices an ordinarily competent attorney . . . would assess as reasonable to achieve a 'specific goal.'" *Cone v. Bell*, 243 F.3d 961, 978 (6th Cir. 2001). On the facts here, this one fits the bill. This remains true, regardless of whether counsel's strategy was ultimately unsuccessful, *Moss v. Hofbauer*, 286 F.3d 851, 859 (6th Cir. 2002) ("an ineffective-assistance-of-counsel claim cannot survive so long as the decisions of a defendant's trial counsel were reasonable, even if mistaken"), because the decision to present self-defense to counteract the felony murder charge fell within the wide scope of professionally competent assistance. *Ramonez v. Berghuis*, 490 F.3d 482, 489 (6th Cir. 2007) ("Constitutionally effective counsel must develop trial strategy in the true sense . . . based on what investigation reveals witnesses will actually testify to.")

The Court of Criminal Appeals' determination of "no deficient performance" and its rejection of this ineffective-assistance claim did not result from either an unreasonable factual determination in light of the evidence before it or an unreasonable application of *Strickland*. The writ will not issue with respect to this claim.

## IV. Conclusion

In this case and for the above reasons, this petition will be **DENIED**, and this application for a writ of habeas corpus will be **DISMISSED**.

## V. Certificate of Appealability

One final matter remains for discussion: whether to issue a certificate of appealability (COA) should Graves file a notice of appeal. *See* 28 U.S.C. § 2253(c)(1).

21

Graves qualifies for issuance of a COA if he has made a substantial showing of the denial of a constitutional right; he makes such a showing by demonstrating that reasonable jurists might question the correctness of the Court's procedural rulings or its assessment of his constitutional claims. *See Slack v. McDaniel,* 529 U.S. 473 (2000). The Court has found that some of his claims were procedurally defaulted and that he had failed to make a showing of cause and prejudice to overcome this obstacle. The Court also found that the claims which were adjudicated in state court would not support habeas corpus relief because, after an examination of the state court decisions, the record, and the relevant governing law in Supreme Court cases, those decisions did not run contrary to well established federal law, did not reflect that the state courts had unreasonably applied that law, and did not demonstrate that the state courts had disposed of those claims by unreasonably determining the facts offered to those courts.

The Court now finds that reasonable jurists could not disagree with the resolution of these claims and could not conclude that they "are adequate to deserve encouragement proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). No COA shall issue. 28 U.S.C. § 2253; Fed. R. App. P. 22(b).

A separate order will enter.

**ENTER**:

LEON JORDAN
UNITED STATES DISTRICT JUDGE

22